George S. ALLEN, Plaintiff,

v.

HOWMEDICA LEIBINGER, GmhH, Howmedica Leibinger, Inc., Howmedica, Inc., and Pfizer, Inc., Defendant.

No. 99–MC–0058–GV.

United States District Court, W.D. Tennessee, Western Division.

Nov. 22, 1999.

William W. Dunlap, Jr., Harris Shelton Dunlap & Cobb, Memphis, TN, for plaintiff.

Diane Vescovo, United States Magistrate Judge, Bradley E. Trammell, Baker Donelson Bearman & Caldwell, Memphis, TN, James K. Hammond, Thomas L. Jarvis, Finnegan Henderson Farabow Garrett & Dunner LLP, Washington, DC, for non-party.

## ORDER DENYING PLAINTIFF'S MOTION TO COMPEL

VESCOVO, United States Magistrate Judge.

Before the court is the September 1, 1999 motion of the plaintiff, George S. Allen, to compel compliance with a subpoena duces tecum [1] issued June 15, 1999, for production of financial, marketing, and licensing information from a nonparty, Medtronic Sofamor Danek ("Danek"). The motion was referred to the United States Magistrate Judge for a determination. For the reasons that follow, the motion is denied.[2]

### I. Factual and Procedural Background

The underlying lawsuit for which plaintiff seeks documents is currently pending in the United States District Court for the District of Delaware.[3] It involves claims under Ohio law of tortious interference with business relations and of deceptive trade practices

---

1. Plaintiff's motion to compel is styled "Motion to Compel Discovery Pursuant to Subpoena Duces Tecum." Although the subpoena issued to Danek was both a subpoena *duces tecum* and a subpoena *ad testificandum,* the court's discussion in this order is limited to plaintiff's subpoena for documents in accordance with plaintiff's motion, but the court's analysis for the most part would apply with equal force to the subpoena for testimony.

2. In deciding this motion, this court has considered the following four pleadings: (1) Motion to Compel Discovery and Memorandum of Facts and Law in Support of Motion to Compel, filed September 1, 1999; (2) Nonparty Medtronic Sofamor Danek Inc.'s Opposition to the Motion to Compel, filed September 24, 1999; (3) Reply to Nonparty Medtronic Sofamor Danek Inc.'s Opposition to the Motion to Compel, filed October 7, 1999; and (4) Nonparty Medtronic Sofamor Danek Inc.'s Sur-reply filed October 22, 1999. Plaintiff's Sur–Sur–Reply filed November 8, 1999 has not been considered. The rules do not contemplate a sur-sur-reply, and no permission was obtained to file one. There must be some end to pleadings; otherwise, pleadings could continue ad infinitum and the court could never rule. If the court were to allow a sur-sur-reply, Danek, in all fairness, would have to be given another opportunity to respond. Furthermore, at the time the sur-sur-reply was filed, the court had already spent innumerable hours carefully considering the arguments advanced in the four other pleadings. Moreover, the court has already been especially lenient in considering the additional motion pleadings—the reply and the sur-reply—neither of which are contemplated by the rules nor for which either party obtained permission.

3. The court's recitation of the facts is based on a copy of the complaint filed by Allen in the Delaware action, attached as Exhibit F to Danek's opposition to the motion to compel, and facts set forth in the memoranda filed in this ancillary proceeding. Because the underlying lawsuit is not pending in this district, the court is limited in its understanding of the facts.

concerning a surgical navigation system[4] known as ACUSTAR developed and patented in the late 1980's and early 1990's by the plaintiff, George Allen, a medical doctor, along with others. ACUSTAR utilizes fiducial marker technology.[5] At issue in the case is a patent license agreement for ACUSTAR. To commercialize his product, Dr. Allen entered into an exclusive patent license agreement in September 1997 with Picker International, Inc., transferring all the ACUSTAR assets to Picker in exchange for "monetary payments."[6] (Nonparty Danek's Opp'n to the Mot. to Compel, Ex. F "Complaint" ¶ 15.) Dr. Allen alleges in the complaint in the Delaware action that the defendants interfered with the Picker license of his patent and that the defendants' tortious conduct resulted in his receiving a "substantially depressed" contract price from Picker than he otherwise could have obtained. (*Id.* ¶¶ 47, 49.) In particular, Dr. Allen claims that the defendants obtained an invalid patent for fiducial markers and used that patent to interfere with Dr. Allen's attempt to commercialize his entire surgical navigation system, which includes but is not limited to fiducial markers. He now asserts that he would have "attained a large or dominant share of [the surgical navigation] market, but for [d]efendants' tortious conduct that largely prevented him from entering the market."

4. A surgical navigation system consists of hardware and software. It permits doctors to create a three-dimensional model of a patient's body by taking a scan of the patient's body before surgery. During surgery, the computer system provides an image of the scan with a display of real-time movement of surgical instruments. Thus, a surgeon can determine with a great deal of accuracy where the surgical tools are in relation to the target area of the surgery and use the display to guide movements of the tool.

5. "Fiducial markers are used by medical practitioners to locate precise points on the human body through medical imaging, i.e., various magnetic resonance imaging (MRI) procedures, X–RAY procedures, computer tomography (CT) procedures, and positron emission procedures. For example, fiducial marker technology can be used to enhance a surgeon's ability to perform "virtual surgery," wherein the surgeon has access to an instantaneous and interactive digital map of patient's body part." (Nonparty Danek's Opp'n to the Mot. to Compel, Ex. F "Complaint" ¶ 15.)

6. Dr. Allen's Delaware complaint does not mention any ongoing royalty payments. Dr. Allen

(Def.'s Mem. of Facts and Law in Supp. of Mot. to Compel at 1.)

The nonparty Danek holds the patent for and manufactures, sells, and licenses a surgical navigational system known as StealthStation. Danek acquired the technology for StealthStation when it purchased Surgical Navigation Technologies, Inc. in 1995. Because of the success of StealthStation technology, Danek holds a dominant position in the surgical navigation market. The major difference between Allen's ACUSTAR and Danek's StealthStation is that the ACUSTAR involves subcutaneous implanted fiducial markers and Danek uses adhesive surface fiducial markers.

In the subpoena, Dr. Allen seeks three general categories of information from Danek: (1) Danek's financial information concerning StealthStation, any other similar surgical navigation system, and fiducial markers used with the systems, including actual sales data, past and present sales projections, costs, profits, and marketing plans; (2) information about Danek's licenses of StealthStation fiducial markers and patents of Dr. Richard D. Bucholz, including both applications for licenses and finalized licenses; and (3) details about the features and operation of StealthStation and fiducial markers used with it.[7]

mentions "up-front money and royalty payments" in his memorandum in support of his motion to compel, but he does not definitively state that the Picker contract price included royalties. (Mem. of Facts and Law in Supp. of Mot. to Compel Discovery at 2.)

7. Dr. Allen seeks deposition testimony only, not documents, as to this last category of information. Nevertheless, both Dr. Allen and Danek have included discussions of this category in their memoranda and the court will consider it as a request for documents.

Specifically, Allen's subpoena duces tecum sought:
1. Documents sufficient to show the actual annual sales of (a) the StealthStation surgical navigation system, (b) any similar Sofamor Danek USA surgical navigation systems, and (c) any fiducial markers used with such system, since the first year that such systems were sold.
2. All documents relating to past and present projections of sales of (a) the StealthStation surgical navigation system, (b) any similar So-

## II. Analysis

In support of the motion to compel, Dr. Allen asserts that Danek's market position is an excellent measure of the damages due him by the defendants. He alleges that absent defendants' tortious interference he would have become the market leader for the type of products that Danek now markets. He also believes that Danek's license agreements would be evidence of the value he should have received for license of his technology. Additionally, he asserts that he needs limited information about the features and operations of StealthStation to validate the comparison of ACUSTAR to StealthStation for damages purposes.

In response, as an initial matter, Danek notes that it is a nonparty to the Delaware action and argues that this factor weighs heavily against producing the documents. Next, Danek raises three primary objections to the subpoena. First, Danek objects to the relevancy and necessity of the information to the Delaware action. Second, Danek urges that the discovery requested would impose significant burden and expense on it. Finally, Danek argues that its trade secrets and financial information would be compromised by disclosing the information that plaintiff seeks, and a protective order would not adequately shield any of Danek's trade secrets from public disclosure.

There is no general prohibition on discovery from non-parties to a lawsuit. *See Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.,* 813 F.2d 1207, 1210 (Fed.Cir.1987) (holding that "[t]he administration of justice would not be aided ... by a rule relieving all persons from giving particular evidence on the sole ground that they are not parties to the suit.").[8] However, some courts have considered nonparty status as one factor when weighing the burdens that discovery may impose. *See, e.g., Katz v. Batavia Marine,* 984 F.2d 422, 424 (Fed.Cir.1993) and cases cited therein; *see also Truswal,* 813 F.2d at 1210. In the present case, Danek is not a party to the underlying Delaware lawsuit and thus is entitled to consideration of its nonparty status as one factor in the analysis of the burdens imposed upon it by compliance with Dr. Allen's subpoena.

### A. Relevancy

The Federal Rules of Civil Procedure permit discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action ...." Fed.R.Civ.P. 26(b)(1). Relevance for purposes of discovery is, of course, defined very broadly. *See, e.g., Andritz–Sprout–Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609, 631 (M.D.Pa.1997). The information sought need not be admissible in court in order to be relevant. Rather, the relevance burden is met if the party can show that the

---

famor Danek USA surgical navigation systems, and/or (c) any fiducial markers used with such systems, since the first year that projections of sales for such systems were made.

3. Documents sufficient to show the costs incurred and profits made on (a) the StealthStation surgical navigation system, (b) any similar Sofamor Danek USA surgical navigation systems, and (c) any fiducial markers used with such systems, including but not limited to the research and development expenses incurred in connection with the StealthStation surgical navigation system, any similar Sofamor Danek USA surgical navigation systems, and/or any fiducial markers used with such systems.

4. Any patent license agreements on technology utilized in the StealthStation surgical navigation system and/or any fiducial markers used with that system, including but not limited to any license agreements on patent(s) naming Richard D. Bucholz as an inventor.

5. All documents relating to negotiations regarding patent license agreements on technolo-

gy utilized in the StealthStation surgical navigation system and/or any fiducial markers used with that system, regardless of whether such negotiations led to actual agreements.

6. All documents relating to any marketing plans for (a) the StealthStation surgical navigation system, (b) any similar Sofamor Danek USA surgical navigation systems, and/or (c) any fiducial markers used with such systems.

8. The Federal Circuit is the controlling circuit for many of the issues in the present discovery dispute, as it holds exclusive appellate jurisdiction over matters arising under the patent laws. 28 U.S.C. § 1295(a)(1) and § 1338(a). Dr. Allen's complaint in the Delaware action makes clear that patent law is implicated. He alleges federal question jurisdiction "because a substantial question of federal patent law is pleaded as a necessary element of the state law causes of action." (Reply to Nonparty's Opp'n to the Mot. to Compel, Ex. B., ¶ 7.)

information sought "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Nevertheless, the right to discovery is not unlimited, and does have "ultimate and necessary boundaries." *Hickman v. Taylor*, 329 U.S. 495, 497, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Discovery may be denied "where, in the court's judgment, the inquiry lies in a speculative area." *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1326 (Fed.Cir. 1990).

■ Once an objection to the relevance of the information sought is raised, the burden shifts to the party seeking the information to demonstrate that the requests are relevant to the subject matter involved in the pending action. *See Andritz–Sprout–Bauer*, 174 F.R.D. at 631 (internal citations omitted). The party seeking discovery must be able to "articulate the possible linkage between the discovery sought and admissible evidence." 7 Moore's Federal Practice § 37.22[2][B]. In the present case, Dr. Allen bears the burden of showing the relevance of Danek's position in the surgical navigation market and Danek's confidential sales and marketing information to his pending claims for damages under Ohio law for tortious interference with his fiducial marker patent.[9]

Under somewhat similar circumstances, the Federal Circuit determined that a district court abused its discretion by ordering discovery from nonparties for the purpose of establishing a claim of damages. *See Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318 (Fed.Cir.1990). In that case, Micro Motion, the patent owner, brought an ancillary proceeding to obtain discovery from several nonparties for the purpose of establishing damages in a patent infringement suit pending in another district. Each of the nonparties was a competitor of Micro Motion. The discovery sought included sales information, information about the configuration and operation of the products, and customer lists. Concerned that wide-ranging discovery from nonparties could be used to harass a competitor, the court held that Micro Motion had failed to establish the relevance of the requested information to its claims for damages

and lost profits. In determining relevancy, the court examined whether the damage theories asserted by Micro Motion were recognized and viable damage theories in the underlying patent infringement case and whether Micro Motion had shown that each discovery request was directly related to proving an element of a damage theory. *Id.* at 1325. The district court in which the patent infringement case was pending had not determined the viability of Micro Motion's damage theories. Importantly, the Federal Circuit noted that the simple fact that because a patent infringement complaint against another seeks damages or even lost profits is not sufficient to establish relevancy for the purpose of discovery. *Id.* at 1325, 1328. More is required "than a theoretical argument that the requested information somehow relates" to an action pending in another district. *Id.* A district court in New York followed similar reasoning in denying a patent holder's subpoena of documents from a nonparty competitor. *See Fort James Corp. v. Sweetheart Cup Co.*, No. CIV.A. 97–C–1221, 1998 WL 709813 (S.D.N.Y. Oct. 8, 1998) (holding in an ancillary proceeding that the patentor had not met its burden of establishing the relevance of the sales and marketing information of a non-party competitor to its claims for damages under a convoyed sales theory, and that the viability of the convoyed sales theory was pending in the underlying lawsuit).

In the present case, it is unclear that Dr. Allen's "lost market share" theory of damages is the "subject matter involved in the pending action" in Delaware and that the information plaintiff seeks from Danek is directly related to his theory of damages. The only damages allegations in the complaint are that the price paid by Picker for the exclusive ACUSTAR license was "substantially depressed", (Complaint ¶ 47), and "adversely affected." (Complaint ¶ 49). All references to "lost market share" are simply arguments in the motion.

As legal authority for his position that his "lost market share" damages theory is the subject matter of the underlying lawsuit and

---

**9.** Dr. Allen has not argued that the discovery sought from Danek is in any way relevant to its

claim for deceptive trade practices, and the court therefore does not explicitly address the issue.

is a valid, recognized theory, Dr. Allen cites two cases.[10] Relying on *Physicians Weight Loss Ctrs. of Am. v. Creighton,* No. 90–CV–2066, 1992 U.S. Dist. LEXIS 12720 (N.D.Ohio Mar. 30, 1992), Dr. Allen points out that pecuniary harm is an essential element of a tortious interference claim under Ohio law. The Ohio Supreme Court of Ohio has defined the tort of interference with business relations as follows: "One who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused thereby." *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 379 N.E.2d 235, 238 (1977); *see also Creighton,* 1992 U.S. Dist. LEXIS 12720, at *31 (citing *Walter v. Murphy,* 61 Ohio App.3d 553, 573 N.E.2d 678 (1988)). As with any other tort, therefore, proving a claim for tortious interference with business relations is predicated on a showing by the plaintiff that he or she suffered some level of harm or damages.

Next, citing *Stulberg v. Intermedics Orthopedics, Inc.,* No. 94 C 4805, 1999 WL 759608, 1999 U.S. Dist. LEXIS 14284, at *25–26 (N.D.Ill. Aug. 31, 1999), Dr. Allen further argues that "lost or diminished market share can be used as evidence of damages" to establish the pecuniary harm element. (Reply to Nonparty's Opp'n to the Mot. to Compel at 4.) In *Stulberg,* the district court for the Northern District of Illinois upheld an arbitrator's calculation of damages in a tortious interference with patent case. *Stulberg* involved a licensee who decided to quit marketing a patented product, a knee system, because one of its subsidiaries marketed a competing product. The year before the decision was made to discontinue the product, sales had been over $6 million. The court found that the arbitrator correctly reasoned that defendants' tortious conduct diminished the future sales of the patented knee system and appropriately determined the market value of the patent by considering "not only the [patentor's] right to promote and sell the CKS knee system, but also the benefits of customer loyalty." *Stulberg v. Intermedics Orthopedics, Inc.,* 1999 WL 759608, 1999 U.S. Dist. LEXIS 14284, at 8. To the extent that "customer loyalty" is equated with lost market, then "lost market share" was used by the *Stulberg* court in determining damages in a tortious interference with patent case. *Stulberg,* however, did not involve Ohio law and therefore is not controlling. Indeed, Dr. Allen fails to cite any Ohio cases in which diminution of market share was used to determine damages in a tortious interference with contract case.

Even if diminution or lost market share is a recognized method under Ohio law of demonstrating pecuniary harm in a tortious interference case, Dr. Allen has not presented any factual support to this court, by affidavit or otherwise, for his arguments in his motion pleadings that he has actually suffered a lost or diminished market share in the surgical navigation market and that the loss was somehow linked to defendants' interference with his fiducial markers patent. The allegations of tortious interference in the complaint only concern conduct of the defendants prior to or contemporaneously with the consummation of the Picker license. (Complaint ¶¶ 46, 47.) There are no allegations that Dr. Allen or Picker ever even attempted to enter the market. The record is completely devoid of any information as to the chain of events transpiring after Picker acquired the exclusive license for ACUSTAR. Unlike the situation in *Stulberg* where the licensee was successfully engaged in selling the patented product, Dr. Allen has failed to demonstrate that he or the licensee, Picker International, ever took any affirmative steps to enter the surgical navigational systems market or man-

---

10. Dr. Allen also relies heavily on *Life Point Systems, Inc. v. Cargill, Inc.,* No. C–93 20352 JW, 1997 U.S. Dist. LEXIS 22845 (N.D.Cal. Feb. 6, 1997), but *Life Point* is not on point. *Life Point* does not involve discovery of financial data from a non-party competitor in an ancillary proceeding. Rather, *Life Point* is a report of a special master on a partial summary judgment motion on the issue of damages in a tort action. The special master considered the plaintiffs' interrogatory responses and affidavits of six third parties to determine whether "specific facts exist in the record from which reasonable inferences can be drawn that plaintiffs' suffered damages as alleged," i.e., loss of licensing opportunities or less lucrative licenses because of defendants' tortious conduct. *Id.* at 30. In other words, this was a test of the viability of plaintiffs' damage theory.

ufacture or sell the ACUSTAR system after Picker acquired the exclusive license. In fact, as noted in Danek's sur-reply, the only information on the present record related to sales of the ACUSTAR system is found on a brochure which states that ACUSTAR is an "investigational device" that is "not available for sale in the U.S.A." (See Reply to Nonparty's Opp'n to the Mot. to Compel, Ex. D.) This court has no idea whether Picker manufactured and sold any units, or whether Picker had the capital and ability to manufacture and sell units.

Assuming for argument's sake the validity of Dr. Allen's damage theory in the underlying tort case, both legally and factually, Dr. Allen has failed to demonstrate how the discovery of Danek's sales, marketing, and financial information would lead to admissible evidence. There is no information as to the size of the relevant market or the number of other competing companies or products. There is no indication that Allen or Picker were in any way similarly situated to Danek with respect to capitalization and other resources necessary to successfully manufacture and sell surgical navigation systems. Other companies in the market may be more similarly situated than Danek. It takes more than merely a good idea or a successful patent application to produce and distribute high-tech medical devices. As the Federal Circuit noted in *American Standard v. Pfizer, Inc.*, 828 F.2d 734 (Fed.Cir.1987), a court may decide "that many factors unrelated to the claimed invention influenced ... sales." *Id.* at 742. Danek is a well-established and well-funded corporation; Dr. Allen is an entrepreneur. It would require a quantum leap of faith to presume that the only barrier to Dr. Allen's ability to supplant Danek as a leader in the surgical navigation market was the defendants' allegedly tortious conduct.

Nor has Dr. Allen demonstrated how Danek's present market position is linked to his 1997 agreement with Picker. As noted previously, the complaint does not allege any royalty agreement between plaintiff and Picker. The only mention of royalties is a vague, unsubstantiated reference in plaintiff's motion. On the record before this court, it is not clear if the contract price was merely a fixed amount or included royalties. Not only has Dr. Allen failed to address this issue in its entirety, he has failed to even attach a copy of his contract with Picker—the very contract which he alleges defendants interfered with—to his complaint or his present motion. Without the agreement, this court would merely be speculating as to the terms of the contract price, and in particular, as to whether any ongoing royalty payments were part of the deal. Unless plaintiff has some right to collect ongoing royalties, the court fails to see how Danek's present sales and marketing information would be relevant to damages in the form of a reduced contract price negotiated over two years ago. Absent royalties, Dr. Allen's and Picker's own projections of sales at the time of the contract negotiations would be the best evidence of damages for a less-than-favorable fixed contract price.

The Federal Circuit has warned that when a court's only connection to a case is to resolve a discovery dispute, the court should be "especially hesitant to pass judgment on what constitutes relevant evidence thereunder." *Truswal*, 813 F.2d at 1211–12. "Where relevance is in doubt, the rule indicates that the court should be permissive." *Id.* Nevertheless, in order to determine in an ancillary proceeding if discovery is "relevant to the subject matter" of the lawsuit and is "calculated to lead to admissible evidence," the plaintiff must, at a minimum, set forth a recognized damage theory. Additionally, the plaintiff must enunciate some factual support for the theory with some degree of particularity. Broad, general conclusory allegations of "lost market share" or "reduced price" will not suffice. Dr. Allen's damage theory of "lost market share" is too tenuous at this time to permit discovery of the leading competitor's financial, sales, and marketing information. Because of the type of information sought and the amount of documents potentially involved, this court is reluctant to authorize discovery of this nature, until the trial court has at least recognized the viability of Dr. Allen's damage theory under the facts of this case.

For all of these reasons, Dr. Allen has failed to demonstrate even the minimal level

of relevance required under Fed.R.Civ.P. 26(b)(1).

### B. *Undue Burden and Expense*

■ Danek also maintains that retrieving the subpoenaed documents would impose a substantial burden on it, whereas similar information is readily available from public sources. To determine whether production poses an undue burden, the court should consider the burden placed on the producing party, as well as the necessity of the information for the party seeking production, and whether the information can be obtained from more convenient sources. Where information sought by discovery is relevant but places an undue burden on the producing party, discovery will be denied. Fed. R.Civ.P. 45(c)(3)(A)(iv); Fed.R.Civ.P. 26(b)(2)(i).

Danek clearly faces a substantial burden if it is forced to comply with Dr. Allen's discovery requests. According to the affidavit of Scott Wilson, Danek's Senior Manager of Accounting, Danek would have to review nearly 70,000 documents to respond to the present requests for information. (*See* Decl. of Scott D. Wilson, Nonparty's Opp'n to the Mot. to Compel at Ex. I.) Wilson also states that the documents requested are stored in a variety of different places, involve a number of different departments, and would take nearly a month of man-hours to provide. (*Id.*) Wilson's affidavit stands unrebutted, despite Dr. Allen's efforts to belittle the required effort with his unsworn statements that all he seeks are a "few" marketing reports and a "few" license agreements.

Nevertheless, the sheer volume of documents would be no reason, in and of itself, to deny discovery if there were no other reasonable way for plaintiff to obtain relevant information. However, information similar to that sought by Dr. Allen seems to be publicly available from sources that are more convenient, less burdensome, or less expensive, without subjecting Danek to undue burden. *See* Fed.R.Civ.P. 45(c)(3)(A)(iv). Although Dr. Allen claimed in his initial reply that

information relating to his claim for damages was unavailable from public sources, (*see* Reply to Nonparty's Opp'n to the Mot. to Compel at 10 and Ex. F), Danek has included in its sur-reply technical and financial information publicly available on the Internet regarding BrainLAB, Elekta, Radionics, and Zeiss, all of which are involved in the surgical navigation field. (*See* Nonparty's Sur–Reply at Ex. A.) Danek even attached Elekta's forty-two page annual report, which contains sales information, market analyses, and the claim that "Elekta is the market leader for highly sophisticated stereotactic equipment." [11] (Nonparty's Sur-reply, Ex. A at 16.) The burden is on the party seeking information to "establish a need for the breadth of the information sought in response to [a nonparty's] prima facie showing that the discovery [would be] burdensome." *Katz*, 984 F.2d at 423–24. In the absence of some showing by Dr. Allen that the publicly available information regarding other surgical navigation technology producers is inadequate, the burden that production would place on Danek is unreasonable, particularly in light of Danek's nonparty status.

### C. *Confidential Information and Trade Secrets*

■ In determining whether information designated as "confidential" or "trade secrets" must be disclosed, courts apply a shifting-burden analysis. *See R & D Business v. Xerox*, 152 F.R.D. 195 (D.Col.1993). The party from whom discovery is sought bears the initial burden of establishing that the information is a "trade secret" and that its disclosure could be harmful. The burden then shifts to the requesting party to establish that the information is both relevant and necessary to the pending action. *See Pulsecard, Inc. v. Discover Card Services, Inc.*, No. 94–2304–EEO, 1995 WL 526533, 1995 U.S. Dist. LEXIS 13111, at *18 (D.Kan. Aug. 31, 1995). Finally, the court must balance the need for the information against the possible harm of disclosure.

---

11. Stereotaxy is a mathematical methodology for guiding surgical instruments into the brain. The StealthStation System is an advanced surgical system permitting frameless stereotactic surgery through image guidance and navigation.

Some of the requests here clearly seek documents or other information that could be classified as "trade secrets." As the Federal Circuit noted in *American Std., Inc. v. Pfizer, Inc.*, 828 F.2d 734 (Fed.Cir.1987), a party may show that information is confidential by demonstrating, *inter alia*, that it has a policy of requiring confidentiality agreements from employees. *Id.* at 740. Danek has such a policy. (Nonparty's Opp'n to the Mot. to Compel at Ex. J.) Additionally, a court may review whether the requests seek "types of information that courts have generally viewed as trade secrets or confidential information," *id.* at 740, such as product formulas, marketing plans, or information relating to marketing decisions. Although *American Standard* reviewed Indiana law, the Indiana definition for trade secrets is nearly identical to the Tennessee definition. The Indiana standard is that to be a trade secret, "information must be kept secret and [the company] must derive economic value from that secrecy." *American Standard*, 828 F.2d at 740. The Tennessee definition is that "a trade secret may consist of any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Hickory Specialties, Inc. v. B & L Lab., Inc.*, 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979).

In the present case, Dr. Allen seeks marketing information, sales data, sales projections, and product details. All of these are the type of information which give one an advantage over competition and have traditionally been protected. *See, e.g., American Standard*, 828 F.2d at 740. The court finds therefore that the character of the information sought is such that it is properly characterized as trade secrets or confidential information.

The next issue is whether harm would result to Danek if the information were released and whether it would be possible for the court to craft a protective order or nondisclosure agreement that would obviate the risk of harm. As many courts have noted, even if something is confidential or a trade secret, disclosure may still be required if the disclosure is not harmful. *See American Standard*, 828 F.2d at 740 (holding that "[h]aving shown the information to be confidential, one seeking a protective order must then demonstrate that disclosure might be harmful."). Danek argues, however, that because Dr. Allen seeks to show that his product would have made him, rather than Danek, the dominant market leader, disclosure of confidential information to this putative competitor would be extremely harmful. "Courts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor." *American Standard*, 828 F.2d at 741 (citations omitted). This court agrees.

Dr. Allen claims that he would be the dominant manufacturer of surgical navigation products were it not for the tortious interference of the defendants. Thus, he establishes himself as the direct competitor of Danek, while simultaneously seeking a variety of confidential information from Danek. As previously noted, the disclosure of confidential information to a competitor is often extremely harmful, and Dr. Allen has not demonstrated such a need for information from Danek as opposed to the publicly available information regarding other similarly situated companies, to outweigh the potential harm to Danek from disclosure.

Additionally, a protective order could not protect Danek's interests in this case. Danek is not a party to the Delaware action, nor does it have interests that are aligned with Dr. Allen or the defendants. Instead, based on the present record, all parties to the Delaware action either are competitors of Danek or would like to be. Thus, none of the parties have a strong incentive to defend Danek's interests when issues of the confidentiality of the documents arise during trial, and Danek has no standing to object to the Delaware court's decisions as to what is or is not confidential or what part of the trial should be conducted in camera. *See generally Micro Motion*, 894 F.2d at 1325. Thus, there is a great risk of harm to Danek from disclosure of confidential information.

### III. Conclusion

■ Because Dr. Allen has failed to demonstrate that the information it seeks from

Danek, a nonparty, is relevant and necessary to the pending Delaware action, discovery would impose an undue burden on Danek, and there is a substantial risk of harm from disclosure of confidential information, plaintiff's motion to compel is DENIED.

IT IS SO ORDERED.